## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **AMALGAMATED TRANSIT UNION ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-1790** |
| **NEW ORLEANS REGIONAL TRANSIT AUTHORITY ET AL.** | **SECTION I** |

### ORDER & REASONS

Before the Court are cross-motions for summary judgment. Defendant New Orleans Regional Transit Authority ("RTA") filed a motion[1] for summary judgment, which defendant Alex Wiggins ("Wiggins") adopted[2] in full. Plaintiffs Amalgamated Transit Union ("ATU") and Valerie Jefferson ("Jefferson") filed a single motion for summary judgment.[3] For the reasons that follow, the Court denies the motions.

### I.        BACKGROUND

The Court first recounts the facts on which the parties agree. Jefferson worked as a bus driver for the RTA between 1993 and 2021.[4] In 2019, Jefferson was elected president of her chapter of the ATU, which represents RTA bus drivers.[5] As

---

[1] R. Doc. No. 52.
[2] R. Doc. No. 56. This order will refer to defendants' motions as a single motion.
[3] R. Doc. No. 55.
[4] R. Doc. No. 55-2, ¶ 1; R. Doc. No. 58-1, ¶ 1.
[5] R. Doc. No. 55-2, ¶¶ 2, 4; R. Doc. No. 58-1, ¶¶ 2, 4.

1

president, she negotiated with senior RTA officials over union members' pay, benefits, and working conditions.[6] Defendant Wiggins became the CEO of RTA in 2019.[7]

In August of 2021, as Hurricane Ida was approaching New Orleans, Jefferson spent several days negotiating with RTA executives over a hazard pay agreement for bus drivers who stayed in the city during the storm.[8] Negotiations took place between, among others, RTA Chief Operating Officer Thomas Stringer ("Stringer") and RTA Deputy CEO for Administration and Finance Mark Major ("Major") on behalf of RTA; and Jefferson on behalf of the ATU.[9] An agreement was signed on September 5, 2021.[10]

On September 8, 2021, Jefferson was working a "spread shift" for RTA.[11] A "spread shift" is a shift in which the employee works a certain number of hours in the morning, has a paid break, and then returns to work in the afternoon.[12]

From this point forward, the parties' accounts of the facts differ. Pointing to Jefferson's deposition testimony,[13] plaintiffs assert that while Jefferson was on her break, she heard a rumor that RTA intended to renege on the hazard pay

---

[6] R. Doc. No. 55-2, ¶ 4, R. Doc. No. 58-1, ¶ 4.
[7] R. Doc. No. 55-2, ¶ 5; R. Doc. No. 58-1, ¶ 5.
[8] R. Doc. No. 55-2, ¶¶ 8, 10; R. Doc. No. 58-1, ¶¶ 8, 10.
[9] R. Doc. No. 55-2, ¶ 12; R. Doc. No. 58-1, ¶ 12.
[10] R. Doc. No. 55-2, ¶ 15; R. Doc. No. 58-1, ¶ 15.
[11] R. Doc. No. 55-2, ¶ 16; R. Doc. No. 58-1, ¶ 16.
[12] R. Doc. No. 55-2, ¶ 17, R. Doc. No. 58-1, ¶ 17. The parties dispute whether a driver who works a spread shift is "off" during the break. R. Doc. No. 58-1, ¶ 17.
[13] R. Doc. No. 55-4, 84:14–21.

agreement.[14] Defendants dispute that Jefferson heard such a rumor because, during her deposition, she could not identify who told her about the rumor.[15]

Supported by Jefferson's deposition testimony, plaintiffs claim that Jefferson went to speak to Dale Delpit ("Delpit"), who worked for Major, to ask about the rumor.[16] Plaintiffs state that Delpit told Jefferson that Delpit did not have the agreement, that Jefferson produced the agreement and stated that workers needed to be paid according to it, and that Delpit then said she needed to speak to Major.[17] Plaintiffs state that Jefferson and Delpit then called Major, who refused to confirm that the RTA would honor the agreement.[18]

Plaintiffs assert, again based on Jefferson's deposition testimony, that Jefferson then went to talk to Stringer, who informed her that he had just been fired, but did not tell her why he had been fired.[19] Defendants dispute that Jefferson went to speak with Stringer, and that Stringer told her that he had been fired, but do not

---

[14] R. Doc. No. 55-2, ¶ 20.

[15] R. Doc. No. 58-1, ¶ 20; R. Doc. No. 52-8, 81:14−24.

[16] R. Doc. No. 55-2, ¶ 21 (citing Jefferson's deposition testimony, R. Doc. No, 55-4, at 85:11−16). Defendants dispute this, R. Doc. No. 58-1, ¶ 21, but the factual basis for their dispute is unclear, as they point only to deposition testimony by Wiggins and Anderson indicating that Jefferson used the word "bitch" when she spoke to Wiggins. R. Doc. No. 58-1, n.13.

[17] R. Doc. No. 55-2, ¶ 22 (citing Jefferson's deposition testimony, R. Doc. No, 55-4, at 85:21−25, 86:2−7).

[18] *Id.* ¶ 23 (citing Jefferson's deposition testimony, R. Doc. No, 55-4, at 89:2−21). Defendants dispute that Delpit made these statements, that Delpit and Jefferson called Major, and that Major refused to confirm that the RTA would honor the agreement, but the basis for the dispute is again unclear, as they again cite to the testimony referenced *supra* note 16. R. Doc. No. 58-1, ¶¶ 22−23, nn. 14−15.

[19] R. Doc. No. 55-2, ¶¶ 24−25 (citing Jefferson's deposition testimony, R. Doc. No. 55-4, at 87:8−21, 88:8−11).

dispute that she became aware that Stringer had been fired and that she did not know why he had been fired.[20]

Per Jefferson's deposition testimony, Jefferson became concerned that Stringer's termination indicated that RTA planned to renege on the hazard pay agreement, because Stringer had played a role in negotiating the agreement.[21] Defendants dispute that this information increased Jefferson's concern, as Stringer was only one of several RTA executives who were involved in the negotiation of the agreement, and Wiggins was responsible for giving final approval of the agreement.[22]

The parties agree that around 12:30 P.M., Jefferson entered the hallway leading to Wiggins' office and saw Wiggins at the other end of the hallway.[23] The parties also agree that Darwyn Anderson ("Anderson"), RTA Chief Human Resources Officer, was present.[24]

Crucially, the parties dispute what happened next. According to plaintiffs, again supported by Jefferson's deposition testimony, Jefferson asked Wiggins if it was

---

[20] R. Doc. No. 58-1, ¶¶ 24−25. The factual basis for defendants' dispute is again unclear, as they again cite to the deposition testimony about Jefferson's alleged use of the word "bitch" in support. *See supra* notes 16, 18.

[21] R. Doc. No. 55-2, ¶ 27 (citing Jefferson's deposition testimony, R. Doc. No. 55-4, at 66:22−25).

[22] R. Doc. No. 58-1, ¶ 27 (citing Wiggins' deposition testimony, R. Doc. No. 58-2, at 12:1−13:25, 47:11−20).

[23] R. Doc. No. 55-2, ¶ 29; R. Doc. No. 58-1, ¶ 29.

[24] R. Doc. No. 52-3, ¶ 10; R. Doc. No. 57-1, ¶ 10.

true that Stringer had been fired.[25] Wiggins responded that it was true.[26] Jefferson then turned around and, with her back to Wiggins, said "It's on now, I have to contact the [union] executive board," and turned and left the hallway.[27] According to defendants, and supported by deposition testimony by Wiggins and Anderson, Jefferson walked into the hallway in the RTA executive office suite, asked Wiggins whether Stringer had been terminated, and then, before Wiggins answered, turned and said either "It's on now, bitch," or "It is on bitch."[28]

The parties largely agree on what happened next. Wiggins called RTA general counsel and emailed human resources to discuss the interaction with Jefferson.[29] About an hour later, Jefferson was instructed to report to the human resources department, where she was asked to give an account of her interaction with Wiggins.[30] She was then presented with an already prepared termination notice.[31] The termination notice stated that Jefferson had spoken "in a threatening

---

[25] R. Doc. No. 55-2, ¶ 30 (citing Jefferson's deposition testimony, R. Doc. No. 55-4, at 92:2−9).

[26] R. Doc. No. 55-2, ¶ 31 (citing Jefferson's deposition testimony, R. Doc. No. 55-4, at 91:10−14).

[27] *Id.* ¶¶ 33, 31 (citing Jefferson's deposition testimony, R. Doc. No. 55-4, at 92:5−9). The Court notes that, in her deposition, Jefferson stated that she also said, "I know exactly who working here." R. Doc. No. 55-4, at 92:5.

[28] R. Doc. No. 58-1, ¶¶ 31, 33 (citing Wiggins' deposition testimony, R. Doc. No. 58-2, at 13:9−16, Anderson's deposition testimony, R. Doc. No. 58-3, 33:13−4).

[29] R. Doc. No. 55-2, ¶ 35; R. Doc. No. 58-1, ¶ 35.

[30] R. Doc. No. 55-2, ¶¶ 38−39; R. Doc. No. 58-1, ¶¶ 38−39.

[31] R. Doc. No. 55-2, ¶ 40; R. Doc. No. 58-1, ¶ 40.

manner" and thereby violated ATU's "Workplace Violence Prevention" policy.[32] The termination notice also stated that she had used the word "bitch" in the interaction.[33]

Jefferson and ATU filed a complaint in this matter on September 28, 2021, asserting that RTA's termination of Jefferson amounted to retaliation for her exercise of her rights to free speech and free association guaranteed by the First Amendment and 42 U.S.C. § 1983.[34] Plaintiffs seek to have Jefferson reinstated with backpay, compensatory damages for Jefferson, injunctive relief ordering defendants to refrain from retaliating against Jefferson or any other ATU member for exercise of their First Amendment rights, nominal damages for ATU, and attorney's fees pursuant to 42 U.S.C. § 1988.[35]

## II.   STANDARDS OF LAW

### A.   Summary Judgment

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that

---

[32] R. Doc. No. 55-2, ¶ 41; R. Doc. No. 58-1, ¶ 41. Plaintiffs assert that the reason given for termination on the notice is "contrary to the reason of insubordination given by Wiggins" in his email to human resources and as stated in a later deposition. R. Doc. No. 55-2, ¶ 41. Defendants dispute that the reason provided on the notice is contrary to Wiggins' provided reason. R. Doc. No. 58-1, ¶ 41.

[33] R. Doc. No. 55-2, ¶ 42; R. Doc. No. 58-1, ¶ 42. Plaintiffs assert that this portion of the notice was factually incorrect. R. Doc. No. 55-2, ¶ 42.

[34] R. Doc. No. 1, at 8–9. In a later-filed declaration, Jefferson further claims that RTA has violated her rights by excluding her from a public meeting on September 27, 2022. R. Doc. No. 64-2. Because this information is not relevant to the cause of action raised in her complaint, the Court does not consider it with respect to the instant motions for summary judgment.

[35] R. Doc. No. 1, at 10.

there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the nonmovant fails to meet their burden of showing a

genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

In reviewing cross-motions for summary judgment, the court examines "each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 823 F.3d 1006, 1011 (5th Cir. 2016).

### B. First Amendment Retaliation—Freedom of Speech

A government agency "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). "[T]he First Amendment nonetheless permits government

employers to exercise a degree of control over their employees' words and actions." *Hardesty v. Cochran*, 621 F. App'x 771, 775 (5th Cir. 2015) (citations omitted).

To succeed on a First Amendment free speech retaliation claim pursuant to § 1983, the plaintiff must show that (1) she suffered an adverse employment action, (2) she spoke as a citizen on a matter of public concern, (3) her interest in speaking outweighs the government's interest in the efficient provision of public services, and (4) the protected speech motivated the adverse employment action. *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (citing *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007)).

Regarding the first element, it is well established that termination of employment is an adverse employment action. *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) ("Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands.").

The second element requires courts to make two separate determinations: first, whether the employee was speaking as a private citizen; and second, whether the employee spoke on a matter of public concern. Regarding the first prong of this element, the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications

from employer discipline." *Garcetti*, 547 U.S. at 421. "Official duties" are tasks that employees are "employed to do." *Id.*

The inquiry of whether an employee speaks pursuant to their official duties "is a practical one." *Gibson v. Kilpatrick*, 773 F.3d 661, 670 (5th Cir. 2014) (quoting *Garcetti*, 547 U.S. at 424). The fact that an employee speaks inside their office, rather than publicly, or that the subject matter of speech relates to their employment, does not necessarily mean that the speech was pursuant to their official duties. *Garcetti*, 547 U.S. at 420–21. The "critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014).

In this fact-intensive analysis, courts consider factors such as whether the employee's job required them to engage in the speech in question, whether the speech in question is typically engaged in by citizens who do not work for the government, and whether the speech in question was the employee "merely voic[ing] a grievance up the chain of command." *Hardesty v. Cochran*, 621 F. App'x 771, 777 (5th Cir. 2015) (per curiam); *accord Foerster v. Bleess*, No. 20-1782, 2022 WL 38996, at *2 (5th Cir. 2022) (unreported) (considering "the relationship between the speech and the employee's job, whether the speech was made up the chain of command, and whether the speech resulted from special knowledge acquired as an employee"). "Whether a statement is made as an employee or a citizen is a question of law." *Graziosi v. City*

*of Greenville, Miss.*, 775 F.3d 731, 736 (5th Cir. 2015) (citing *Davis v. McKinney*, 518 F.3d 304, 315 (5th Cir. 2008)).

When considering the second prong of this analysis—whether the employee's speech addresses a matter of public concern—the court "consider[s] the speech for which the employee was disciplined . . . *not* some other speech." *Commc'ns Workers of Am. v. Ector Cnty. Hosp. Dist.*, 467 F.3d 427, 437 (5th Cir. 2006) (en banc) (emphasis in original) (citing *Waters v. Churchill*, 511 U.S. 661, 679 (1994)). Speech relates to a matter of public concern "when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Moody v. Walker*, No. 20-2656, 2021 WL 3423597, at *11 (E.D. La. Aug. 5, 2021) (Vitter, J.) (quoting *Lane*, 573 U.S. at 241) (internal quotations omitted).

In determining whether employee speech is on a matter of public concern, courts consider the "content, form, and context" of the speech. *Charles v. Grief*, 522 F.3d 508, 514 (5th Cir. 2008) (quoting *Connick*, 461 U.S. at 147−48). The speaker's motive "may be considered," but is not "a determinative factor." *Davis v. Ector Cnty., Tex.*, 40 F.3d 777, 782 (5th Cir. 1994). "The content of speech concerns a matter of public concern '[i]f releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance . . . .'" *Dumas v. St. Tammany Parish Fire Dist. No. 3*, 17-1025, 2017 WL 1969641, at *6 (E.D. La. May

11

12, 2017) (quoting *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001)). "Whether the speech at issue is on a matter of public concern is a question of law that must be determined by the court." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 184 (5th Cir. 2005) (citing *Tompkins v. Vickers*, 26 F.3d 603, 606 (5th Cir. 1994)).

Regarding the third element of a free-speech retaliation claim—the balancing of the government's and the employee's interests—"courts must balance the individual and societal interests that are served when employees speak as citizens on matters of public concern with the needs of government employers attempting to perform their important public functions." *Collins v. Gusman*, No. 14-234, 2015 WL 1468298, at *4 (E.D. La. Mar. 30, 2015) (Vance, J.) (quoting *Garcetti*, 547 U.S. at 420) (internal quotations omitted). This balancing is sometimes referred to as "*Pickering* balancing." *E.g.*, *Salge*, 411 F.3d at 184 (referring to *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). Relevant considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Salge*, 411 F.3d at 192 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). This balancing is also a question of law to be determined by the court. *Davis v. Allen Parish Serv. Dist.*, 210 F. App'x 404, 408 (5th Cir. 2006) (citing *Salge*, 411 F.3d at 184).

### C. First Amendment Retaliation—Freedom of Association

"The [First Amendment] right of association encompasses the right of public employees to join unions and the right of their unions to engage in advocacy and to petition government [o]n their behalf." *Mote v. Walthall*, 902 F.3d 500, 507 (5th Cir. 2018) (quoting *Hitt v. Connell*, 301 F.3d 240, 249 (5th Cir. 2002) (further citations omitted)). Government employers therefore may not take "action whose purpose is either to intimidate public employees from joining a union or from taking an active part in its affairs or to retaliate against those who do." *Id.*

To succeed on a claim of First Amendment retaliation for freedom of association, a plaintiff must show that (1) she suffered an adverse employment action (2) her interest in associating outweighed the employer's interest in efficiency, and (3) her protected activity was a substantial or motivating factor in the adverse employment action. *Hitt*, 301 F.3d at 246 (citing *Breaux v. City of Garland*, 205 F.3d 150, 156, 157 n. 12 (5th Cir. 2000); *Boddie v. City of Columbus*, 989 F.2d 745, 747 (5th Cir. 1993)). Per Fifth Circuit case law, there is no "matter of public concern" element in a right-to-associate retaliation claim. *Coughlin v. Lee*, 946 F.2d 1152, 1158 (5th Cir. 1991); *accord Burnside v. Kaelin*, 773 F. 3d 624, 626 (5th Cir. 2014).

"When a plaintiff's claims arise under both freedom of speech and freedom of association . . . the freedom of association claims are analyzed under the same *Pickering* balancing test used to determine the success of the freedom of speech claims." *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 444 (5th Cir. 1999). A

13

court considering a freedom of association relation claim therefore considers whether the employee's right to free association outweighs the employer's need "to perform their important public functions." *Collins*, 2015 WL 1468298, at *4.

### III.    ANALYSIS

### A.    First Amendment Retaliation—Freedom of Speech

Here, the parties do not dispute that Jefferson suffered an adverse employment action, nor that her speech was the motivation for that action.[36] Instead, the parties dispute (1) whether Jefferson spoke as a citizen on a matter of public concern and (2) whether the balancing of interests pursuant to *Pickering* favors Jefferson or the RTA.

In order to determine whether Jefferson spoke on a matter of public concern, the Court must examine the "content, form, and context" of Jefferson's speech. *Charles*, 522 F.3d at 514. Here, the parties dispute both the content and the context of Jefferson's speech.

Regarding the content of Jefferson's speech, the parties dispute not only whether or not Jefferson used the word "bitch" but also whether or not she referenced contacting the union executive board.[37] Plaintiffs have asserted that Jefferson's speech is protected even if she used the profanity attributed to her by defendants,[38]

---

[36] R. Doc. No. 52-1, at 5; R. Doc. No. 55-1, at 8.

[37] *Compare* R. Doc. No. 55-2, ¶ 33 (plaintiffs' statement of material facts, stating Jefferson said "It's on now, I have to contact the executive board.") *with* R. Doc. No. 55-3, ¶ 10 (defendants' statement of material facts, stating that Jefferson said either "It's on now, bitch" or "It is on bitch.").

[38] R. Doc. No. 55-1, at 12.

but neither plaintiffs nor defendants address the significance of the parties'
disagreement over whether or not Jefferson referenced the executive board.
Regarding the context of Jefferson's speech, the parties are at odds over whether or
not Jefferson was on "union business" when the interaction with Wiggins took place.[39]

The Fifth Circuit has instructed that "speech in the context of union activity
will seldom be personal; most often it will be political speech." *Boddie v. City of
Columbus*, 989 F.2d 745, 750 (5th Cir. 1993). The Court also notes, however, that
courts have declined to "impute . . . a public character" to an employee's speech
"merely because the employee is also a union officer." *Shara v. Me.-Endwell Cent.
Sch. Dist.*, 46 F.4th 77, 88 (2d Cir. 2022). Against the backdrop of the parties' factual
disputes over what Jefferson said and why she said it, the Court cannot accurately
assess whether Jefferson's speech addressed a matter of public concern or was merely
private speech by an employee who happened to be a union officer.

Further, even if either party was able to demonstrate the absence of any
material fact as to whether Jefferson's speech was speech on a matter of public
concern, the Court cannot accurately balance Jefferson's interest in speaking with

---

[39] *E.g.*, R. Doc. No. 52-1, at 8 (defendants' motion for summary judgment) ("Valerie
Jefferson was not on union business at the time of the incident."); R. Doc. No. 55-1,
at 9−10 (plaintiffs' motion for summary judgment):
> The factual record makes it impossible to deny that Ms. Jefferson's speech,
> made on the subject of her union executive board meeting regarding a union-
> management dispute, to someone she only ever talked to about union business,
> in a place she only ever was to conduct union business, made during a time
> when she was off duty during which she had a standard practice of conducting
> union business, was made not pursuant to her job duties but as a citizen, and
> specifically in her role as union president.

the RTA's interest in maintaining efficient operations on the current factual record. Though plaintiffs contend that the RTA cannot succeed on the balancing prong because Wiggins stated in a deposition that Jefferson's speech did not impact the RTA's efficiency,[40] the Court finds that Jefferson's alleged use of profanity is relevant to considerations of whether her speech "impair[ed] discipline by superiors or harmony among co-workers, ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[d] the performance of the speaker's duties or interfere[d] with the regular operation of the enterprise." *Salge*, 411 F.3d at 192. Accordingly, considering plaintiffs' free speech retaliation claim, the Court concludes that neither of the parties has shown that there is no genuine issue of material fact, nor that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56.[41]

## B.    Freedom of Association

The Court first notes that defendants did not address the legal standard applicable to plaintiffs' freedom-of-association claim in either their own motion for summary judgment or their opposition to plaintiffs' motion.

---

[40] R. Doc. No. 57, at 6–7 (referencing Wiggins' deposition testimony, R. Doc. No. 55-5, at 26:16–21 (Wiggins stating that Jefferson's alleged use of the word "bitch" did "not [affect] the efficiency of the agency, but just the order of management")).

[41] The Court recognizes that the determinations of whether Jefferson spoke as a citizen on a matter of public concern and whether the *Pickering* balancing favors Jefferson or the RTA are issues of law which must ultimately be decided by this Court. The Court is unable to perform these legal analyses, however, on a disputed factual record. *See Caruso v. Massapequa Union Free Sch. Dist.*, 478 F. Supp. 2d 377, 384 (E.D.N.Y. 2007) (determining that factual disputes precluded summary judgment on

16

The Court finds, however, that summary judgment for either party on plaintiffs' freedom-of-association retaliation claim is inappropriate for largely the same reasons that summary judgment on the freedom-of-speech claim is inappropriate.

Though the matter of public concern element is not applicable to freedom of association retaliation claims, *Coughlin*, 946 F.2d at 1158, a plaintiff asserting such a claim must show that "her protected activity was a substantial or motivating factor in the adverse employment action." *Hitt*, 301 F.3d at 246. Union activity is generally protected by the First Amendment right of association. *Mote*, 902 F.3d at 507. The parties dispute, however, whether Jefferson was engaged in union activity during the interaction that preceded her termination.[42] The parties' contrary accounts of Jefferson's interaction with Wiggins make it impossible to assess whether Jefferson was exercising her First Amendment right to associate with union members, and whether her termination was in retaliation for any protected conduct. In addition, for the same reasons stated above, the parties' factual disputes make it difficult for the Court to balance the interests of Jefferson and the RTA.

Accordingly,

---

the issue of whether the plaintiff's speech was pursuant to her job duties); *Herrera v. Med. Ctr. Hosp.*, 241 F. Supp. 2d 601, 613−14 (E.D. La. 2002) (Vance, J.) (finding that evidentiary determinations were necessary before the court could perform the *Pickering* balancing).

[42] *See supra* note 39.

**IT IS ORDERED** that the plaintiffs' motion[43] for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motions[44] for summary judgment are **DENIED.**

New Orleans, Louisiana, October 21, 2022.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[43] R. Doc. No. 55.
[44] R. Doc. Nos. 52, 56.